IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | : | |
| V. | : | Case No.: **3:25-MJ-00320** |
| **WILLIAM STANLEY,** | : | |
| **HEATHER MORROW** | : | |
| | : | |

## Motion for Sanctions (Including Dismissal) for the Destruction of Exculpatory Evidence and Misrepresentations by Federal Agents in Sworn Documents used to obtain an Arrest Warrant

Heather Morrow timely files before this Court this Motion, requesting this Court to impose sanctions against the United States based upon the failure of its agents to preserve evidence, which they knew was exculpatory, and for misleading the Court concerning the actions of the Defendants, in particular Ms. Morrow.  An evidentiary hearing is requested.

The federal agents in this matter were not wearing body cameras.  The Defendants have now learned that the ICE facility at 6130 Tyvola Centre Drive in Charlotte, where the entire course of conduct occurred, has its own video system, which captured portions of the incident that led to these charges.  Discovery now shows that FBI agents admitted viewing portions of this video (Bates 600) and instructed ICE agents to preserve it.   Despite these instructions and formal requests from the Defense, and ignoring admonitions from the Court to the attorneys for the Government, this video was not preserved (*id.*) and has now been destroyed.  The video would have

shown that the Defendants were not on Government property. The video would have further shown that that the deportations agents' initial claims of what occurred in accounting of the alleged assault were materially false.

The initial statements made by deportation agents led to Morrow's arrest on trumped-up felony charges. These charges were later dismissed after the attorneys for the Government viewed videotape of what actually happened. Only then did the attorneys for the Government realize that while deportation agents claimed that Ms. Morrow committed a felony assault by attempting to "jump on the back of" a deportation agent,[1] this did not happen. These agents made these false statements to the FBI, knowing that they would be used to obtain a criminal complaint alleging a felony assault on a law enforcement officer.

The Defendants do not bring this Motion lightly. But honesty and fair dealing should be expected of Government agents, particularly where liberty is at stake. Here, these agents have both demonstrably misrepresented what occurred and permitted the destruction of the very evidence that would show what actually occurred. The Court should impose sanctions and order dismissal.

**RELEVANT PROCEDURAL AND FACTUAL BACKGROUND**

**Part I: Destruction of and Failure to Preserve Evidence.**

[1] *Exhibit A*, Criminal Complaint & Affidavit in Case 3:25-MJ-305.

Morrow was arrested on a criminal complaint for felony assault charges on November 16, 2025. Shortly after Morrow's arrest, Undersigned Counsel notified the United States Attorney's Office of irregularities in the case. The Defense also provided the Government with a video taken by an observer proving that the statements made by deportation agents were demonstrably false, providing the Government the opportunity to dismiss the false complaint prior to a likely-embarrassing preliminary hearing.

The Government's attorneys, consistent with their obligation to see that justice is done, recharged the case as a misdemeanor in the face of video evidence showing the agents' version was not true.

As a result of these irregularities, the Defense promptly filed a motion for preservation of evidence, including video footage. Dkt. # 6, December 8, 2025. The Government filed a response, indicating that it was aware ICE captured a video and it notified them to preserve it:

> 3. In addition to discovery already produced, the government has contacted Immigration and Customs Enforcement/Enforcement and Removal Operations (ICE/ERO) personnel about obtaining surveillance camera footage that allegedly shows the defendants and other persons arriving at and walking around grounds of the ICE/ERO building before they encountered the Deportation Officers on November 16, 2025. To date, the government has not successfully obtained this footage.

Dkt. # 20, January 6, 2026.

Later, and at arraignment, the magistrate-judge held a hearing on the Defendant's omnibus motion for preservation. At that hearing, the Government acknowledged its obligation to preserve evidence and represented that it had done so:

So having said that, we have requested, requested, and we have gotten everything that they say that they have. And so I think there's one or two reports that need to be done, but I anticipate, by Monday or Tuesday, everything that the Government has will be turned over.
Going back to the due process, we are -- contacted the relevant agencies. We have made a request for Giglio. If any of that exists regarding the Government's officers, we should have that also by next week. So everything that they say that they have, we have gotten and we're going to turn it over.

Transcript of February, 26, 2026, hearing. Dkt. # 38, pp. 12-13.

Following the conclusion of argument, the Court cautioned the Government:

Discovery. I want to encourage the Government to do its very best to make sure the defendants have constitutional access to the information they're due to get in a timely manner. And I assume that, as some of this machinery starts to run, then some of these issues related to speedy trial and other issues like that will kind of get resolved in the way that they do in a felony case.

Dkt. P. 12.

The Court then entered an order granting the Defense's request to issue subpoenas. Those subpoenas called for, among other things, the production of all videos maintained or obtained by ICE. Dkt. # 36. The Defense served those subpoenas on ICE.

Five months later, on July 2, 2026, the Government produced additional discovery to the Defendants. Included in that discovery was a report from FBI Special Agent Michael Gregory stating that on November 19, 2025, he discovered that ICE was in possession of video evidence that recorded at least portions of the conduct at issue, including footage of Heather Morrow at the facility. The report further noted that, "in an effort to fully review the video, SA Gregory requested ICE personnel to get in touch with the company that manages the surveillance camera system and inquire how to download the

camera footage from the morning of November 16, 2025." Bates # 600. There is no indication that the agents created a screen recording.

Sadly, the report continues, "on January 30, 2026, Mission Support Specialist Westhead attempted to pull the surveillance camera footage on November 16, 2025 up; however, it was no longer available. Mission Support Specialist Westhead contacted the company that manages the surveillance camera system and confirmed the footage was no longer available."

Before July 2, the Defense was unaware of the existence or destruction of this video. To the contrary, a previous discovery production contained a report stating that, on November 19, 2025, federal agents stated that they had been informed that the ICE "surveillance cameras haven't worked in several years." Bates # 190.

- **Summary timeline**

| Date | Event | Description |
|---|---|---|
| Nov. 16, 2025 | Morrow Arrested | Morrow arrested. Deportation agents provide statements to the FBI alleging that Morrow jumped onto the back of an agent. |
| Nov. 17, 2025 | Criminal Complaint Obtained | Based on DHS agents' false statements, the Government obtains a federal criminal complaint against Morrow (Case No. 3:25-MJ-305), alleging felony assault on a federal law enforcement officer. |
| Nov. 18, 2025 | DOJ Press Release Issued | Before the criminal complaint is unsealed, DOJ disseminates a press release accusing Morrow of feloniously assaulting agents. |
| Nov. 19, 2025 | Investigation | Agents Gregory and Mascola investigate the scene, including searching for surveillance cameras. |
| Nov. 24, 2025 | Complaint Dismissed and Bill of Information filed. | Criminal complaint dismissed after the Defense provides a by-stander video demonstrating the criminal complaint premised on false allegations. The same day, the Government replaced it with a Bill of Information charging the misdemeanors now before the Court. |

| Nov. 26, 2025 | Report prepared by SA Gregory | SA Gregory enters a report stating that on November 19, 2025, he and SA Mascola determined that no surveillance cameras were functional during the alleged incident. |
|---|---|---|
| Dec. 8, 2025 | Defense Files Preservation Motion | Defense files a formal motion for preservation of evidence, including all ICE video footage (Dkt. #6). |
| Jan. 6, 2026 | Government Acknowledges ICE Video | Government files a written response (Dkt. #20) acknowledging it is aware ICE captured a video and stating it has notified ICE to preserve it. |
| Feb. 6, 2026 | Report entered by SA Gregory | SA Gregory prepares report stating that on November 19, 2025, he and SA Mascola went to ICE to review surveillance footage, and reviewed surveillance footage of Morrow.  Gregory states he instructed ICE to download the footage   On January 30, 2026, he discovered that the footage was not preserved.. |
| Feb. 26, 2026 | Omnibus Hearing; Court Cautions Government and authorizes subpoenas. | Government states it has all available evidence and will produce it. Court cautions the Government about its discovery obligations and asks that it produce in a timely manner.  The Court authorizes subpoenas which call for the production of video and directs the Marshalls to serve them. |
| July 2, 2026 | Additional Discovery Produced | Government produces additional discovery including the February 6, 2026 report acknowledging video was destroyed. |

- **Pattern of conduct**

This is not the first issue of its kind in this case.  ICE previously "lost" and then, following a court hearing, "found" evidence that demonstrates that the conduct at issue was protest activity.  At that same hearing, the Government described ICE's failure to preserve that evidence:

Can you tell me where we are on the things that they requested? Ms. Morrow, the key, the other items that were mentioned, the rally items that they refer to as.

MR. SMITH: Yes, sir. Your Honor, this is -- again, this is unusual. That's why I mentioned the unusual posture of how this case happened, meaning we have -- I -- you know, I have -- I have, the agents have, asked where is this stuff? I mean, seriously, it was -- had it at one point, no longer exists. Folks have checked, they've looked. Right now they're not in the possession of ICRO, which is the agency that collected it that day.

And I think the Court can see the email exchange between Ms. Morrow's co-counsel with one of the supervisors over there. They just don't have it. And I don't know where it happened, I don't know what happened with it, but it just -- it no longer exists. I think there was even a reference in the email exchange that perhaps it was sent to Georgia for some reason. I don't know.

Transcript of February, 26, 2026, hearing. Dkt. # 38, p. 14.

The magistrate court issued a docket order that "the Government, DHS, and ICE SHALL continue searching for Defendants vehicle keys and the rally items." Dkt. # 37. On March 31, 2026, the Government filed a notice motion stating that the "FBI received [the protest items] from the DHS." The discovery simply states that on March 23, 2026, SA Gregory and SA Mascola collected the property from Deportation Agent Medina.

**Part II.  Materially False Statements by the ICE Agents Lead to Felony Charges  and this Matter.**

On November 16, 2025, deportation agents arrested Defendant.  Those agents promptly transferred Defendant and some of her personal property to FBI agents.  To support felony charges against Defendant, at least 3 deportation agents involved in the November 16 incident prepared reports, memoranda, email, and other documents recounting their version of events to their supervisors and the FBI.  Thus, ICE claimed in a memorandum that "an ERO Officer removed MORROW from the other ERO Officer's back." Elsewhere, a deportation agent involved in this incident stated that "a female subject came up behind me and jumped on my back to prevent me from arresting the male subject."

On November 17, 2025, based on the evidence created by the agents, the Government obtained a criminal complaint[2] against Defendant, giving rise to case 3:25-MJ-305.   On November 18, 2025, (before the complaint was unsealed) the Department of Justice disseminated a press release[3] claiming that the Defendant feloniously assaulted the agents by "grabbing the officer's shoulders and attempting to jump on the officer's back." The following day, the Department of Justice published the same press release on its website.[4]

---

[2] *Exhibit A.*
[3] *Exhibit B*, November 18, 2025, Press Release.
[4] U.S. Attorney's Office, Western District of North Carolina, *Charlotte Woman Charged With*

As a result, Defendant was not only arrested for a federal felony and unlawfully detained, she was painted as dangerous criminal and suspended from her job.

After the criminal complaint was unsealed, the Defense provided the Government with video footage obtained from a bystander[5] demonstrating that the allegations in the criminal complaint were based on false allegations made by the deportation agents, including the claim that Defendant grabbed Deportation Officer 1 by the shoulders and jumped while preparing to tackle him.

On November 24, 2025, a preliminary hearing was set to take place for Defendant to challenge the criminal complaint she was facing. On the eve of the hearing, and now aware of the true facts, the Government moved to dismiss the complaint without prejudice, and the Court granted the Government's motion to dismiss that same day.

Shortly thereafter, the Government issued a bill of information[6] against Defendant and codefendant William Stanley, giving rise to this case. The offense date and general accusations are the same for both the bill of

---

*Assaulting Federal Officer*, U.S. Department of Justice, Nov. 19, 2025 (accessed on May 20, 2026, at https://www.justice.gov/usao-wdnc/pr/charlotte-woman-charged-assaulting-federal-officer)

[5] *Exhibit C*, Video Footage Provided to Government.

[6] *Exhibit D*, Bill of Information.

information and the now-dismissed criminal complaint.  The same information, now discredited, forms the basis for these charges.

## ARGUMENT

I.   **The Government's Failure To Preserve Ice Facility Surveillance Footage Violated Due Process Rights, Requiring Dismissal.**

> [I]f the subject matter of . . . a [defendant's] request [for discovery] is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

*United States v. Agurs*, 427 U.S. 97, 106 (1976).

In the face of a specific request, via motion, for potentially exculpatory records, the Government failed to safeguard those records from destruction. ICE was on notice from the Defense, from the Government, from the Court, and from other agencies to safeguard the potentially exculpatory records.  It failed to do so.  Because the Government failed to act, potentially exculpatory video was destroyed.

As recently as June 5, 2026, the Fourth Circuit has expressed its opinion on the seriousness of preserving video evidence (albeit in a civil case). In *Shaw v. Foreman,* __ F.3d __, No. 24-7015 at *8, the Court repeated that, "where bad faith is involved in a spoilation sanction, the penalty may be a terminating action."  (citing *Cole v. Keller Indus., Inc.,* 132 F.3d 1044, 1046

(4th Cir., 1998)).  There, prison guards failed to preserve an allegedly exculpatory video, despite being put on notice of its existence.  The Fourth Circuit remanded with instructions to the district court to "consider the sanctions motion in full."  The standard should of course be higher when it comes to criminal cases and the accompanying constitutional protections and liberty interests.

## A. Legal Standard — *Trombetta* and *Youngblood.*

The government violates a defendant's due process rights when (i) it destroys potentially exculpatory evidence, (ii) not in good faith. *Youngblood*, 488 U.S. at 58 ("[Where] a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence . . . constitute[s] a denial of due process of law.").

Some circuits require the additional showing that the evidence is "irreplaceable." *See, e.g.*, *Olszewski III v. Spencer*, 466 F.3d 47, 55–58 (1st Cir. 2006). Although the Fourth Circuit has not explicitly adopted this test, it stems from the common sense requirement that destruction that causes no prejudice does not violate due process. Cf. *California v. Trombetta*, 467 U.S. 479, 489 (1984). Therefore, the Defense addresses this factor as well.

   1. **The destroyed records were potentially exculpatory under *Trombetta and Youngblood***

Under *Trombetta*, the preservation duty attaches when evidence possesses "an exculpatory value that was apparent before the evidence was destroyed," and "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means." 467 U.S. at 489. Both elements are satisfied here.

The potentially exculpatory value of the ICE facility video was apparent from the moment FBI Special Agent Michael Gregory reviewed it on November 19, 2025 — three days after Morrow's arrest. SA Gregory went to the ICE facility specifically to investigate the alleged assault. After reviewing the footage, he immediately requested ICE personnel to preserve the video. Bates #600.

Surveillance footage of a protest that deportation agents allege crossed the line to an assault on government agents is plainly relevant. SA Gregory recognized the same.

The context makes the exculpatory value more obvious: the Government filed a criminal complaint alleging a felony assault based on statements by deportation officers that Morrow jumped on the back of agents. After viewing a bystander video demonstrating the statements were false, the Government dismissed that complaint and issued a new bill of information generically alleging assault or resist. Surveillance video would go to the truth or falsity of agent statements.

Moreover, the video would also be the best evidence of where the incident took place. The information charges obstruction and other crimes on Federal property. As shown elsewhere, the ICE facility is in reality a building leased from a private landowner, and the lease does not extend to the place at which this conduct allegedly occurred. Video of the protest is material and would have demonstrated that the Defendants were not on federal property.

The building's own surveillance footage, covering the facility from a fixed vantage point, is the most objective available evidence. The footage is irreplaceable. The footage from the bystander video is clearly useful, but it has limits. It does not show the position of other deportation agents, does not show where the full protest took place, is limited to the vantage point of the camera-person, and only captures a short moment in time. It would have also shown who else was present and provided the Defense the opportunity to interview additional witnesses. And, because the deportation agents have previously and materially misrepresented what actually occurred, their testimony is not an acceptable substitute.

### 2. The Bad Faith Test is Satisfied.

The bad faith inquiry focuses on five issues:

(1) whether the government had explicit notice the defendant believed the evidence was exculpatory;
(2) whether that claim is conclusory, or whether it was backed by objective, independent evidence rather than mere conjecture;

(3) whether the government had the ability to control the evidence's disposition;
(4) whether the evidence was important to the defense; and
(5) whether the government has offered an innocent explanation for the destruction.

*See, e.g. United States v. Bohl*, 25 F.3d 904, 909–10 (10th Cir. 1994); *United States v. Gardner*, No. 4:14-CR-61-H, 2015 WL 1951809, at *2 (E.D.N.C. Apr. 29, 2015). All five factors support Morrow's request.

### i. The Government Had Explicit Notice the Defense Believed the Video was Exculpatory.

The defense filed a formal motion for preservation of evidence on December 8, 2025 — less than a month after Morrow's arrest and well before the footage was destroyed. Dkt. #6. The motion specifically called for ICE video footage.

On January 6, 2026, the Government filed a written response acknowledging that it was "aware ICE captured a video" and representing that it "notified them to preserve it." Dkt. #20.

The FBI agents acknowledged the same. They viewed a video that showed Heather Morrow at ICE and instructed ICE to preserve the video.

### ii. The Exculpatory Claim Was Non-Conclusory.

The entire prosecution rests on the question of what Heather Morrow did at the ICE facility on November 16, 2025. Did she obstruct agents, fail to follow

their commands, cause a disturbance, and assault them?  Or did she participate in a protest that was not on protected property, without committing any crime?

Deportation agents alleged Morrow grabbed an officer by the shoulders and leaped onto his back to prevent an arrest.  A bystander video proved those allegations false — so demonstrably false, that the government dismissed its own felony complaint on the eve of a preliminary hearing rather than defend the allegations.

ICE's own surveillance footage, positioned at the facility and covering the same event, would confirm or supplement the bystander video.  It would otherwise provide evidence demonstrating exactly where protesters were located—which is outside of property owned by the Government.

### iii.     The Government Had the Ability to Prevent the Destruction.

The surveillance camera, while on Government property, appears to have been maintained by third party company.  However, ICE had access to and control of the footage.  In his report, SA Gregory acknowledged:

> located at 6130 Tyvola Centre Drive, Charlotte, North Carolina in an effort to review surveillance footage that may have captured the events the morning of November 16, 2025.  Mission Support Specialist Carey Westhead, cellular phone number ███████████    email address ████████████████ assisted with gaining access to the surveillance camera footage.  A visual review of the camera footage was conducted and it was noted tree foliage

The Government, through FBI agents, viewed the video and instructed ICE to preserve it.   His instructions confirm that the government both recognized the need to act and had the means to do so.  The footage disappeared

between the time Gregory directed its preservation and January 30, 2026, while the defense's preservation motion was pending and while the government had represented to this Court that ICE had been notified. That the footage was nonetheless lost on the government's watch does not constitute an innocent explanation — it is the definition of the failure at issue.

**iv. The Video Was Critical to the Defense.**

As previously argued, the charges against Morrow depend entirely on what happened at the ICE facility on November 16, 2025. The government's witnesses to that event have been shown to be unreliable narrators. The ICE facility's surveillance footage would provide direct, objective evidence of her innocence.

The Court apparently did not consider this a fishing expedition, as it authorized defense subpoenas specifically for this footage. Dkt. #36. The Government did not contest the subpoenas.

**v. There Is No Innocent Explanation.**

The government's handling of this evidence produced two irreconcilable accounts of the footage's very existence. The more damaging account was held for nearly eight months.

The Court and the Defense told the Government to mind its discovery obligations. ICE, a government agency under the Department of Homeland

Security, was instructed by the Court, by the Defense, by the US Attorney's Office, and by the FBI to preserve a video that was plainly relevant to the case.

The violation is compounded by the timing of disclosure. The February 6 report — which acknowledged the footage existed and was lost — was not produced until July 2, 2026. The defense was unaware of the video's existence or destruction until that production. Five months had elapsed between the hearing at which the government told the Court it had all available evidence and would produce it, and the disclosure that significant video evidence in the case had been destroyed on the Government's watch.

And most significantly, the Government permitted its attorneys to represent to the Court that it had preserved all evidence (or was in the process of doing so) on February 26, At that time, a federal agent had already produced a report that indicated the evidence was gone. The Government permitted its attorneys to make a representation to the Court that, in light of the facts known to the agents, was materially misleading.

The United States Supreme Court has stated that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106. Yet, that is exactly what the Government did here. In the face of a specific request for discovery – one that was pending before the Court at the time of the destruction of the evidence – the Government did not safeguard the evidence.

The Supreme Court has recognized that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf." *Kyles*, 514 U.S. at 437. The government cannot avoid punishment for constitutional obligations by delegating them to an agency subcomponent when that delegation fails.

Nor is the video an isolated incident. ICE already has a history ***within this same case*** of playing fast and loose with evidence. Protest evidence was inexplicably lost for months. Only after motions by the Defense resulting in a court order did the protest items materialize (without explanation). The discovery simply states that on March 23, 2026, SA Gregory and SA Mascola collected the property from Deportation Agent Medina.

## B. The Destroyed Evidence Is Irreplaceable.

The government cannot cure this loss. An adverse inference instruction would tell the jury to assume the video would have helped Morrow, but it cannot recreate footage of the actual event or give the defense a means of confronting the government's witnesses with objective evidence of what occurred. Agent testimony — from the same agents whose false accounts this prosecution rides on — is no substitute.

The bystander video, while valuable, is from a limited vantage point, and is of a limited duration. It was taken by an observer the Government may attempt to paint as biased. It cannot replicate what an overhead ICE facility

security camera would have captured while it recorded during the entirety of the protest.

## C. Dismissal Is the Only Appropriate Remedy.

This Court has broad authority to fashion remedies for due process violations caused by the government's failure to preserve evidence. That authority extends to dismissal and should be exercised.

II. **False Statements Made by Deportation agents in a Criminal Complaint, and ICE's Failure to Preserve Relevant Video Footage, Despite Repeated Warnings, Constitutes Egregious Conduct and Merits Dismissal.**

Following Supreme Court precedent, the Fourth Circuit has recognized that "there may be 'a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Hare*, 820 F.3d 93, 102 (4th Cir. 2016) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). The actions must be "'shocking' or offensive to traditional notions of fundamental fairness.'" *Id*. (citing *United States v. Hasan*, 718 F.3d 338, 343 (4th Cir. 2013)). "[O]nly those claims alleging violation of particular constitutional guarantees are likely to succeed." *Id*. (citing *United States v. Jones*, 13 F.3d 100, 104 (4th Cir. 1993)).

Egregious conduct goes beyond the destruction of material evidence. Deportation agents and the FBI also violated Morrow's constitutional

guarantees to be free from unreasonable searches and seizures, and to be free from arrest without probable cause. *See Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014) (acknowledging Fourth Amendment claim based on use of fabricated evidence for arrest and prosecution); *see also Franks v. Delaware*, 438 U.S. 154, 155-156 (1978) (warrant obtained on false statements violates Fourth Amendment, so hearing required if preliminary showing is made),

The deportation agents falsely claimed to other Government actors and representatives that Defendant grabbed a deportation agent by his shoulders and leaped off her feet to tackle him. Deportation agents made these statements to the FBI, knowing that the statements would be used as probable cause to obtain a felony criminal charge. The statements were also parroted in a public press release and then to higher-ups in the DHS chain of command. Defendant was arrested, transferred to Gaston County, and spent a night in jail due to this verifiably false accusation. The harms were compounded when the Department of Justice's press release that defamed her and caused her to be suspended from her job.

Despite the expansive documentation and reach of the deportation agents' false allegations, even limited video footage of the incident quickly disproved them and clearly demonstrated that the statements made by the agents were false. The agents' conduct cannot be written off as a simple misunderstanding in a chaotic situation, because the same false statement

was knowingly repeated by multiple DHS agents. This is further supported by the fact that *additional* false statements were made that DHS agents pulled Defendant off the agents who she had tackled.

Instead of entirely dismissing the case, the Government has proceeded on a watered-down bill of information. Yet the agents' conduct remains offensive to traditional notions of fundamental fairness. This Court should not permit this prosecution from continuing unchecked. The Government should not be allowed to clean the deportation agents' hands by dismissing the maliciously prosecuted felony and pursue a misdemeanor on the same grounds and based on the testimony of the same agents.

In sum, the deportation agents' conduct violated Defendant's constitutionally protected rights. The Fourth Amendment provides for the right to be secure against unreasonable searches and seizures, as well as ensures that no warrants shall issue but upon probable cause supported by oath or affirmation. By providing false information that they knew would be used to obtain a criminal accusation, the deportation agents violated these constitutional rights through conduct that should offend if not shock the Court. Dismissal is warranted.

This, the 30th day of July, 2026.

Rob Heroy
Attorney for Morrow
NC Bar: 35339
Goodman Carr, PLLC
301 S.McDowell St., Ste. 602
Charlotte, NC 28204
Rheroy@goodmancarr.net

Xavier T. de Janon
Attorney for Morrow
North Carolina Bar #58803
P.O. Box 470221
Charlotte, NC 28247
Tel: (704) 448-9170
Email: xavier@peopleslaw.co

**CERTIFICATE OF SERVICE**

I CERTIFY that I have served the foregoing MOTION TO DISMISS

FOR WANTON DESTRUCTION OF EVIDENCE AND OUTRAGEOUS

GOVERNMENT CONDUCT on Opposing Counsel, via ECF using the CM-

ECF system, which will send notice of such filing to all registered CM/ECF

users.

This, the 30th day of July, 2026.


<u>s/ Rob Heroy</u>
Rob Heroy